BRYAN (WILLIAMSON v.). See Case No. 17,751.

## Case No. 2,067.

### In re BRYANT.

### [Deady, 118.] [1]

### District Court, D. Oregon. July 8, 1865.

SEAMEN—SHIPPING ARTICLES—AGENT OF MASTER —AUTHORITY TO SIGN FOR SEAMEN—DESERTION —ACT JULY 20, 1790—DEFINITION "STATE."

1. The term "state," as used in section 1 of the act for the government of seamen in the merchant service (1 Stat. 131), includes a territory of the United States.
[Cited in Ex parte Hanson, 28 Fed. 131.]
[Compare Miners' Bank v. Iowa, 12 How. (53 U. S.) 1; Hepburn v. Ellzey, 2 Cranch (6 U. S.) 452; Cissel v. McDonald, Case No. 2,729.]

2. The agent of the master in shipping a crew cannot also act as the agent of a seaman and sign his name to the shipping articles, and in such case the seaman is not liable to be arrested for desertion, under section 7 of the act aforesaid.

3. Semble, that a seaman is liable for desertion under section 7 aforesaid, who has signed a contract for a voyage containing the particulars specified in section 1 of the act aforesaid, although such voyage is not undertaken to a foreign port nor in a vessel of fifty tons burthen, and to a port in a state other than an adjoining one from the port of departure.

[At law. Petition by George Bryant, a seaman imprisoned for desertion, for a writ of habeas corpus. The writ issued, and on the hearing thereon the prisoner was discharged.]

W. W. Page and W. F. Trimble. for petitioner.
Andrew J. Lawrence, for respondent.

DEADY, District Judge. By authority of a commitment issued by a justice of the peace within this district, the petitioner, George Bryant, was, on July 15, committed to the jail of Multnomah county, as a deserter from the barkentine William Scranton, to be there confined until July 17, and then delivered to the master of said vessel, to proceed upon the voyage. The vessel sailed from San Francisco to a port or ports on

---

[1] [Case not reported.]

[1] [Reported by Hon. Matthew P. Deady, District Judge, and here reprinted by permission.]

the Columbia river, and thence back to the port of departure. The petitioner left the vessel at Portland and sued for his wages, whereupon the commitment aforesaid was procured by the master. Petitioner then sued out this writ of habeas corpus, which was served upon the jailer of Multnomah county jail. In obedience thereto the jailer has produced the body of the petitioner, and for answer thereto states, that he restrains him by authority of the commitment aforesaid, annexing thereto a copy of the same. The matter was then heard and taken under advisement until to-day.

Section 7 of the act of July 20, 1790 (1 Stat. 134), substantially provides that "If any seaman or mariner, who shall have signed a contract to perform a voyage, shall * * * desert * * * such ship or vessel, it shall be lawful for any justice of the peace, * * * upon the complaint of the master to issue his warrant to apprehend such deserter, and bring him before such justice; and if it shall then appear by due proof that he has signed a contract within the intent and meaning of this act," and that such contract has not been discharged or dissolved, and "that such seaman or mariner has deserted the ship or vessel, * * * the said justice shall commit him to the * * * common jail of the city," etc.

The contract referred to as being "within the intent and meaning" of the act, is prescribed by section 1 thereof, which substantially provides, that: "Every master * * * of a vessel bound from a port in the United States to any foreign port, or of any * * * vessel of the burthen of fifty tons or upwards, bound from a port in one state to a port in any other than an adjoining state, shall, before he proceed on such voyage, make an agreement in writing or in print, with every seaman or mariner, on board such * * * vessel, * * * declaring the voyage or voyages, term or terms of time, for which such seaman or mariner shall be shipped." 1 Stat. 131. To authorize the arrest and confinement of a seaman for desertion under this act, he must have "signed a contract" for the voyage "within the intent and meaning" of section 1. What is such a contract? Must it necessarily be a contract for a voyage to a foreign port, or in a vessel of fifty tons burthen to a port in a state of the United States, other than an adjoining state, or is it sufficient if a contract be made between the master and seaman in print or writing as in such section prescribed without reference to the outward terminus of the voyage or the burthen of the vessel. It would seem from the language of section 7, as well as the reason of the thing, that a seaman who has become bound to perform any lawful voyage, by a contract executed in the manner and containing the particulars prescribed in section 1, ought to be liable to arrest for desertion as well in one instance as another. But as I think this case can be decided without definitely passing upon this question, I leave it with this suggestion.

The voyage described in the contract or shipping articles is from San Francisco to a port or ports on the Columbia river and thence back to the port of departure. The court takes judicial knowledge of the geographical and political divisions of the country, and is therefore aware that a vessel bound to ports on the Columbia river, may be bound to ports in the territory of Washington as well as Oregon—such river being a common boundary between those two political divisions of this country. The territory does not adjoin California, being separated from it by Oregon, and a voyage from a port in California to a port in Washington is so far within the provision in section 1 of the act. But is Washington a "state" within the meaning of the act? I think it is. It is an organized political society existing in pursuance of the supreme law of the land, and upon and within a defined political division of the Republic, and therefore a state within the meaning of that term as used by writers on general law. There is nothing in the act or the reason of it, which indicates that the term is used therein in any narrow or special sense. Its object is to provide for the rights of seamen on voyages which, from their termination at a foreign port, or at a comparatively distant though domestic one, are deemed of sufficient importance to require the security of a written contract. In this connection the primary use of the word "state" appears to be to fix or give the proximate limits beyond which if a voyage is undertaken by a vessel of fifty tons burthen, the contract with the seaman must be in writing and specify the voyage or time for which he ships. The termini or chief ports of the voyage must be places situated in different states other than adjoining ones, or else section 1 of the act does not apply. From this fact, it is manifest that it is the actual or supposed distance of such a voyage, physically and conventionally considered, which led to the enactment of section 1, rather than the fact of its being made between two political societies or states which are members of the Union. If the contract was required to be in writing because of the voyage being undertaken between states as such, a voyage between adjoining states would be within the reason of the act, and therefore not, as now, excluded from its operation. For these reasons it appears to me that the term "state" is used in the act rather as a geographical expression than a political one, and that the territory of Washington, being not only a distinct political society, but also a country with defined and recognized geographical extent and limits, is a "state" within the meaning and intent of the act. The Panama [Case No. 10,702].

I am aware that in Hepburn v. Ellzey, 2 Cranch [6 U. S.] 445, Ch. J. Marshall held, that the word "state" as used in the judi-

ciary act, giving jurisdiction to the circuit courts in cases between a citizen of the state when the suit is brought, and a citizen of another state was limited to the sense in which the term was used ·in the constitution, and did not apply to any political society except a member of the Union, and therefore did not include the District of Columbia. But I do not think the cases parallel. Considering this voyage as having been undertaken between ports of different but not adjoining states, and therefore within the power of section 1, it follows that a properly articled seaman of the vessel is liable under section 7, to be arrested for desertion and returned to the ship. The case is then narrowed down to the question, whether the petitioner "signed the contract" for the voyage. He testifies that he did not sign the shipping articles nor any one for him with his knowledge or consent, and that he never saw them until he saw them here in court, that he never went to sea before, and that he went on board the Scranton in pursuance of an arrangement with the master, to do the best he could as cook. The master, William Cathcart, testifies that William Fullard of San Francisco, was employed by him to ship a crew for the voyage, and while on May 23, 1865, he was standing in the door of Fullard's office, the petitioner came to him and asked to ship as cook with him; that he referred him to Fullard who was inside with the articles on his desk, when petitioner walked in and the witness walked away; that on next day he found the petitioner on board at duty, and when he received the articles from Fullard, the petitioner's name was written at the foot of the agreement, opposite the words: "May 23, cook, $40 per month," and witnessed by Fullard. The shipping articles were introduced in evidence. Several of the crew who sign them do so by making their mark, but the name of the petitioner is subscribed. He testifies that he can neither read or write. His signature appears to be in the same handwriting as that of Fullard's, and it is admitted by the master that such is the fact.

Several objections are made to the shipping articles by counsel for the petitioner—that they lack the certificate of the collector; are not accompanied by a descriptive list of the crew, verified by the master; and that there is no memorandum endorsed upon them of the time when the crew came on board. Except the memorandum, these matters are only required in case of a foreign voyage, and as to it, the contract of hiring may exist independent of it. A neglect to make such memorandum does not vitiate the shipping articles, but in a suit for wages, might authorize the court to allow the seaman's pay to commence from the date of signing them. The articles are presumed to be true, but this presumption is disputable, and may be overcome by parol evidence. It appears that a stranger may in the presence of a party and by his request, sign his name to a deed, and that such signing is to be deemed the act of the party himself. 2 Greenl. Ev. § 295. Here there is no direct evidence that the petitioner consented to Fullard's subscribing his name to the articles. He denies all such consent or even knowledge of it. But if I thought it proper for Fullard to sign the petitioner's name to the articles, I would be slow to allow the testimony of an interested witness like the petitioner, to overcome the presumption that the articles are true. But I do not think the shipping master, who is the agent of the master and the ship should be allowed to subscribe the seaman's name to the shipping articles—to sign the contract for him. His interest is not that of the seaman's but the vessel's; and for every person he gets upon the articles and aboard ship, he is paid. These purveyors of crews for vessels have strong temptations to overreach the improvident and ignorant people with whom they deal. If they could sign articles for a seaman, and then put him upon the proof in another port that he did not authorize or consent to such signing, they might bind him to a voyage that was never mentioned at the time. A person ought not to act as agent for both parties in making a contract, particularly where one of these parties is a common seaman and the other is the master of a vessel, and such person is in the pay of the latter exclusively.

For these reasons, I conclude that the petitioner did not in fact or law sign this contract, and therefore cannot be arrested for desertion. It follows that the imprisonment is without authority of law and wrongful. Judgment that the petitioner be discharged from imprisonment or restraint by virtue of the commitment aforesaid; and on account of the matters and things in the answer herein alleged.